# United States Tax Court

T.C. Memo. 2025-81

CURTIS K. KADAU AND LORI A. KADAU, DECEASED, CURTIS K. KADAU, PERSONAL REPRESENTATIVE,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 286-21.                                    Filed July 31, 2025.

————

*Matthew S. Reddington*, *Steven Todd Miller*, *Matthew S. Spradling*, and *John H. Dies*, for petitioners.

*Dawn L. Danley-Nichols*, *Ryan J. Lonergan*, *John W. Stevens*, *Davie E. Coe*, *Michael V. Cowan*, *Ryan J. Hough*, and *Thomas A. Deamus*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

WEILER, *Judge*: During tax years 2012 through 2017 (years at issue), petitioner Curtis K. Kadau was a shareholder of Surface Engineering & Alloy Co., Inc. (Surface Engineering), an S corporation. For each year at issue, Surface Engineering incurred expenses for purported insurance coverage provided through an arrangement with its affiliated captive insurance company, Risk & Asset Protection Services, Ltd. (Risk & Asset), and RMC Property & Casualty, Ltd. (RMC Property). Respondent principally contends that this arrangement did not provide actual insurance and that petitioners, therefore, cannot deduct these amounts paid. Respondent also contends petitioners are liable for 40% accuracy-related penalties for a transaction lacking

[*2] economic substance, *see* I.R.C. § 6662(b)(6), (i),[1] and in the alternative a 20% penalty under section 6662(a) and (b)(1) or (2). On October 27, 2020, the Internal Revenue Service (IRS) issued two Notices of Deficiency. The first was issued to Mr. Kadau with respect to tax years 2012 through 2014.[2] The second was issued to Mr. Kadau and Lori A. Kadau for tax years 2015 through 2017.[3] The deficiencies and penalties at issue are as follows:

| Tax Year | Deficiency | Accuracy-Related Penalty |
|---|---|---|
| 2012 | $135,858 | $54,343.20 |
| 2013 | 31,371 | 12,236.40 |
| 2014 | 89,100 | 35,640.00 |
| 2015 | 180,633 | 72,253.20 |
| 2016 | 87,387 | 34,954.80 |
| 2017 | 50,588 | 20,235.20 |

In his First Amendment to Answer, filed with leave of the Court, respondent asserts against petitioners an increased tax deficiency of $131,308 for tax year 2017 attributable to Risk & Asset's accumulated earnings and profits. According to respondent, petitioners are subject to tax on Risk & Asset's subpart F income for tax year 2017.

After concessions the issues for decision are (1) whether transactions conducted through a purported microcaptive insurance arrangement among Risk & Asset and other entities during the years at issue constitute insurance for federal income tax purposes;[4] (2) whether

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulatory references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Monetary amounts, other than those appearing in charts, are rounded to the nearest dollar.

[2] Mr. Kadau's filing status was single for tax years 2012 through 2014.

[3] Petitioners Mr. and Mrs. Kadau were married in 2015 and filed married filing jointly for years 2015 through 2017. Mrs. Kadau died on September 3, 2023.

[4] A "captive insurance company" is a "corporation whose stock is owned by one or a small number of companies and which handles all or a part of the insurance needs of its shareholders or their affiliates." *Caylor Land & Dev., Inc. v. Commissioner*, T.C. Memo. 2021-30, at *8 n.4 (citing *Harper Grp. v. Commissioner*, 96 T.C. 45, 46 n.3

**[\*3]** expenses Surface Engineering incurred during the years at issue through the purported microcaptive insurance arrangement constitute ordinary and necessary business expenses deductible under section 162; (3) if not, whether the payments by Surface Engineering should be deemed accumulated earnings and profits and subject to tax as subpart F income of Risk & Asset for tax year 2017 under sections 951(a)(1)(A) and 965; and (4) whether petitioners are liable for accuracy-related penalties under section 6662(a) for the years at issue.[5]

After trial respondent filed a Motion for Order to Show Cause Why Proposed Facts and Evidence Should Not Be Accepted as Established Pursuant to Rule 91(f) (Motion for Order to Show Cause or Motion), and we herein dispose of the Motion.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The First, Second, Third, Fourth, and Fifth Stipulations of Facts and the accompanying Exhibits are incorporated herein by this reference. Petitioners resided in Florida when they timely filed their Petition. Use of the terms "insurance," "insurer," "insured," "policy," "premium," "claim," "reinsurance," "reinsurer," and other insurance-related terms in this Opinion replicate the terminology used by the parties throughout the litigation and do not imply that we have determined that any financial arrangement constitutes insurance, or that any company is an insurance company for federal income tax purposes, as a matter of fact or law.

I.     *Surface Engineering*

During the years at issue Surface Engineering engaged in the production and sale of metal alloys used in the coating of metal surfaces. Mr. Kadau was the president and sole shareholder of Surface

---

(1991), *aff'd*, 979 F.2d 1341 (9th Cir. 1992)). In our prior cases we have adopted the term "microcaptive" to refer to "a small captive insurance company," i.e., one that takes in less than $1.2 or $2.2 million (adjusted for inflation) in premiums depending on the tax year at issue. *See id.*; *see also Avrahami v. Commissioner*, 149 T.C. 144, 179 (2017); *Swift v. Commissioner*, T.C. Memo. 2024-13, at \*2 n.1, *aff'd*, No. 24-60270, 2025 WL 1949147 (5th Cir. July 16, 2025); *Keating v. Commissioner*, T.C. Memo. 2024-2, at \*50 n.52 (explaining that amendments to section 831(b) increased the premium ceiling). We continue to use the term here, consistent with our prior decisions.

[5] Before trial respondent conceded application of the 40% accuracy-related penalty under section 6662(i) for tax years 2016 and 2017.

**[*4]** Engineering during the years at issue. At all times, Surface Engineering was an S corporation.

Surface Engineering purchased and maintained commercial insurance policies with the following annual premiums, policy limits, and inception dates from 2011 to 2017:

| Period | Insurer | Policy | Annual Premium | Occurrence Limit | Aggregate Limit |
|---|---|---|---|---|---|
| 2011–2012 | Amerisure | General Liability | $93,097 | $1,000,000 | $2,000,000 |
| | Amerisure | Property | 25,274 | -0- | -0- |
| | Scottsdale | Business and Management Indemnity | 5,634 | 1,000,000 | 2,000,000 |
| | Amerisure | Automobile | 3,160.56 | 1,000,000 | 1,000,000 |
| | Amerisure | Workers Compensation | 16,957 | -0- | -0- |
| | ACE USA | General Liability | 3,750 | 1,000,000 | 2,000,000 |
| | Fidelity | Flood | 4,230 | 500,000 | 500,000 |

| Period | Insurer | Policy | Annual Premium | Occurrence Limit | Aggregate Limit |
|---|---|---|---|---|---|
| 2012–2013 | Amerisure | General Liability | $122,766 | $1,000,000 | $2,000,000 |
| | Amerisure | Property | 27,980 | -0- | -0- |
| | Amerisure | Automobile | 3,160.56 | 1,000,000 | 1,000,000 |
| | Amerisure | Workers Compensation | 67,143 | -0- | -0- |
| | ACE USA | General Liability | 3,750 | 1,000,000 | 2,000,000 |

[*5]

| Period | Insurer | Policy | Annual Premium | Occurrence Limit | Aggregate Limit |
|---|---|---|---|---|---|
| 2013–2014 | Amerisure | General Liability | $139,523 | $1,000,000 | $2,000,000 |
| | Amerisure | Property | 34,778 | -0- | -0- |
| | Amerisure | Automobile | 5,542 | 1,000,000 | 1,000,000 |
| | Amerisure | Workers Compensation | 103,021 | -0- | -0- |
| | Travelers | ERISA Compliance Bond | 111 | 10,000 | 500,000 |
| | Wright | Flood | 4,786 | 500,000 | 500,000 |

| Period | Insurer | Policy | Annual Premium | Occurrence Limit | Aggregate Limit |
|---|---|---|---|---|---|
| 2014–2015 | Amerisure | General Liability | $169,793 | $1,000,000 | $2,000,000 |
| | Amerisure | Property | 39,160 | -0- | -0- |
| | Amerisure | Automobile | 6,137 | 1,000,000 | 1,000,000 |
| | Amerisure | Workers Compensation | 90,949 | -0- | -0- |
| | Liberty | Private Advantage Policy | 5,405 | 1,000,000 | 1,000,000 |
| | WNC, Inc. | Excess Flood | 2,300 | 200,000 | 200,000 |
| | Wright | Flood | 5,628 | 500,000 | 1,000,000 |

**[\*6]**

| Period | Insurer | Policy | Annual Premium | Occurrence Limit | Aggregate Limit |
|---|---|---|---|---|---|
| 2015–2016 | Amerisure | General Liability | $165,222 | $1,000,000 | $2,000,000 |
| | Amerisure | Property | 50,843 | -0- | -0- |
| | Amerisure | Automobile | 6,675 | 1,000,000 | 1,000,000 |
| | Amerisure | Workers Compensation | 90,949 | -0- | -0- |
| | Liberty | Private Advantage Policy | 5,405 | 1,000,000 | 1,000,000 |
| | ACE USA | General Liability | 3,750 | 1,000,000 | 2,000,000 |
| | Comps Options | Workers Compensation | 224,612 | -0- | -0- |

| Period | Insurer | Policy | Annual Premium | Occurrence Limit | Aggregate Limit |
|---|---|---|---|---|---|
| 2016–2017 | Amerisure | General Liability | $127,056 | $1,000,000 | $2,000,000 |
| | Amerisure | Automobile | 7,321 | 1,000,000 | 1,000,000 |
| | Amerisure | Workers Compensation | 195,758 | -0- | -0- |

| Period | Insurer | Policy | Annual Premium | Occurrence Limit | Aggregate Limit |
|---|---|---|---|---|---|
| 2017–2018 | Amerisure | Automobile | $8,464 | $1,000,000 | $1,000,000 |
| | Amerisure | Workers Compensation | 159,556 | -0- | -0- |

**[*7]** On the basis of the foregoing commercial insurance policies, Surface Engineering reported on its tax returns the following premiums and payment of the following claims:

| Tax Year | Premiums Paid | Claims Paid |
|---|---|---|
| 2012 | $346,549 | $4,950 |
| 2013 | 77,857 | 31,196 |
| 2014 | 151,361 | 391,453 |
| 2015 | 242,205 | -0- |
| 2016 | 247,342 | 171,312 |
| 2017 | 249,634 | 15,013 |
| Total | $1,314,948 | $613,924 |

## II. *The RMC Group and its Affiliates*

The RMC Group is a consortium of independent American corporations and one limited liability company engaged in various business activities relating to insurance and employee benefits. The RMC Group consists of (among other companies) RMC Consultants, Ltd. (RMC Consultants), CJA & Associates, RMC Property, and Endeavor Reinsurance Co., Ltd. (formerly known as RMC Reinsurance Co., Ltd.). Raymond Ankner is the chief executive officer and president of the RMC Group, as well as the owner of each entity in the RMC Group, while Jeffrey Bleiweis is general counsel for the RMC Group.

The RMC Group developed marketing materials such as brochures and memoranda, prepared largely by Mr. Bleiweis, that were circulated to prospective clients. Although prospective clients of the RMC Group were advised to consult their own tax advisers, these promotional materials contained discussions on the tax implications of forming a captive insurance arrangement, including technical memoranda which provided detailed explanations and recent updates regarding captive insurance companies.

W. Blanton Garnett, Jr., a financial adviser with Garnett Retirement Group, sold life insurance and advised clients concerning their financial well-being. Mr. Garnett first learned about captive insurance in 2009 after attending a seminar hosted by CJA & Associates. In 2012 Mr. Garnett provided financial advisory services to Mr. Kadau. Because of Mr. Kadau's expressed interest in forming a

**[\*8]** captive insurance arrangement, Mr. Garnett referred Mr. Kadau to the RMC Group.

III. *Formation of Risk & Asset*

In 2012 Mr. Kadau met with representatives of the RMC Group to discuss formation of a captive insurance arrangement involving Surface Engineering. Surface Engineering retained RMC Consultants to prepare a business plan, act as its licensed insurance manager, and form a captive insurance arrangement in Nevis.[6]

As part of its services for clients, the RMC Group generally requested copies of all insurance policies and arranged the hiring of an actuary. The RMC Group thus hired Marn Rivelle to produce an actuarial report or feasibility study and to perform the general underwriting of insurance for Mr. Kadau. After his meeting with the RMC Group, Mr. Kadau consulted with his accountant and commercial insurance agent.

On or about June 27, 2012, Mr. Kadau completed a feasibility study questionnaire relating to Surface Engineering and its business activities and sent it to Mr. Rivelle. Mr. Rivelle and Mr. Kadau discussed the business activities of Surface Engineering. On July 2, 2012, Mr. Rivelle delivered an actuarial study of the proposed captive insurance arrangement for Surface Engineering.

In the background section of the study, Mr. Rivelle states:

Our underwriting review of the existing business activities and the commercial insurance portfolio of Surface Engineering and Alloy Company, Inc (and its affiliated business entities) has revealed several insurable risks that are not insured by conventional policies. Several of the insurable risks are explicitly excluded from the in-force insurance policies, prohibitively expensive in the standard insurance marketplace, are unavailable in the insurance marketplace or are suitable for self-insurance.

---

[6] Nevis is a small island country in the Caribbean Sea. Along with Saint Kitts, it constitutes the Federation of Saint Kitts and Nevis, otherwise known as the Federation of Saint Christoper and Nevis, which (although it remains part of the Commonwealth realm) gained independence from the United Kingdom in 1983.

**[*9]** Therefore, a captive insurance company (the "Company" or the "Captive") may be established and domiciled in Nevis, to issue the insurance policies described below. All policies would be written on a claims-made basis subject to a retroactive date equal to the policy effective date. All allocated loss adjustment expenses ("ALAE") are covered within the specified policy limits. In addition, any claims incurred and submitted during the first three months of the Captive's operations are subject to a self-insured retention ("SIR") of $50,000 per claim.

As part of his conclusions, Mr. Rivelle recommended annual premium funding for several lines of insurance in the amount of $1,195,680 as follows:

1. **Project Ultimate Limited Losses and Recommended Premium Funding.**

   We project the ultimate limited losses (including ALAE) and recommended premium for 2011/12 to be as shown in Table II-1.

### Table II-1
### Projected Ultimate Limited Losses
### 2011/12

| Policy Coverage (1) | Projected Ultimate Limited Losses Expected Scenario (2) | Projected Ultimate Limited Losses Adverse Scenario (3) | Recommended Premium Funding (4) |
|---|---|---|---|
| (A) All Policies Combined | $564,000 | $1,128,000 | $1,195,680 |

Note: (2), (3) and (4) are Extracted from Appendix C, Exhibit 1.
(4) = (3) x 1.06 (we have assumed annual operating expenses, including a provision for profit and contingencies, of approximately $60,000 to $70,000).

On the basis of the foregoing projections, Mr. Rivelle recommended the following lines of insurance, premiums, deductibles, and policy limits:

**[*10]**

**SURFACE ENGINERRING & ALLOY**                                                                                            **EXHIBIT 1**
CAPTIVE INSURANCE PROGRAM

SUMMARY OF PROJECTED ULTIMATE LIMITED LOSSES

| | Line of Insurance | 50% Confidence Gross Basis Projected Ultmate Limited Losses Expected Scenario | 90% Confidence Gross Basis Projected Ultmate Limited Losses Adverse Scenario | Recommended Premium Funding | Policy Limits | Self-Insured Retention or Deductibles |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| (A) | Administrative Actions | 75,000 | 150,000 | 159,000 | 2,000,000 | 5,000 |
| (B) | Business Interruption | 100,000 | 200,000 | 212,000 | 3,500,000 | 800,000 |
| (C) | Collection Risk | 10,000 | 20,000 | 21,200 | 2,000,000 | 5,000 |
| (D) | Directors & Officers | 30,000 | 60,000 | 63,600 | 2,000,000 | 5,000 |
| (E) | Employment Practices Liability | 4,000 | 8,000 | 8,480 | 2,000,000 | 5,000 |
| (F) | Fiduciary Liability - Difference in Conditions | 25,000 | 50,000 | 53,000 | 2,000,000 | 5,000 |
| (G) | Financial Reporting Errors & Omissions | 5,000 | 10,000 | 10,600 | 2,000,000 | 5,000 |
| (H) | Loss of Key Contract | 100,000 | 200,000 | 212,000 | 2,000,000 | 5,000 |
| (I) | Legal Expense | 55,000 | 110,000 | 116,600 | 2,000,000 | 5,000 |
| (J) | Product Recall | 30,000 | 60,000 | 63,600 | 2,000,000 | 5,000 |
| (K) | Product Liability | 5,000 | 10,000 | 10,600 | 2,000,000 | 5,000 |
| (L) | Product / Service Rework | 40,000 | 80,000 | 84,800 | 2,000,000 | 5,000 |
| (M) | Property (Inventory) | 50,000 | 100,000 | 106,000 | 2,000,000 | 5,000 |
| (N) | Trade Disruption Insurance | 35,000 | 70,000 | 74,200 | 2,000,000 | 5,000 |
| | Total | 564,000 | 1,128,000 | 1,195,680 | | |

Partly on the basis of Mr. Rivelle's actuarial study, RMC Consultants created a business plan for Surface Engineering, calling for the formation of Risk & Asset in Nevis. Risk & Asset, upon regulatory approval, would hold a captive insurance license and offer coverage in the following lines of insurance to Surface Engineering: (1) administrative action, (2) business interruption, (3) collection risk, (4) employment practices liability, (5) legal expenses, (6) directors & officers' liability, (7) fiduciary liability, and (8) reputational risk. The business plan by RMC Consultants, also indicates:

> [Risk & Asset] does not anticipate annual premiums to exceed $1.2 million and how it will "seek election under the US IRS Code for 953(D) as a foreign corporation paying tax on the investment profits of the captive with further 831(B) status as a Non-Life Insurance Company.

The business plan called for Risk & Asset to be initially capitalized with $50,000, and upon the "anticipated license approval the captive will write a selection of the indicated policy coverage for the first year with premiums for 2012 through 2013 of $250,000 with an expansion over time to $1.2 million."

[*11] On October 3, 2012, Risk & Asset was incorporated in Nevis. On the same day in St. Petersburg, Florida, Mr. Kadau and William Jackson Arnold were named directors of Risk & Asset, and they held an initial board of directors meeting. The minutes from this initial meeting reflect that 50,000 shares, all of the initial shares of Risk & Asset, were issued to Mr. Kadau because of his capital contribution of $50,000. The minutes from the initial meeting also reflect that Mr. Kadau was named chairperson, president, and corporate secretary of Risk & Asset, and Mr. Arnold was to serve as treasurer. Mr. Arnold was appointed merely to satisfy the regulatory requirements of Nevis and did not materially participate in the management of Risk & Asset other than by attending meetings of the board of directors.

On October 16, 2012, Mr. Kadau and Mr. Arnold, as directors of Risk & Asset, signed a resolution prepared by RMC Consultants reappointing themselves as officers, establishing a bank account, and appointing themselves members of a claims committee and an investment committee. The resolution also established Mr. Rivelle as actuary, RMC Consultants as insurance managers, the premiums charged by the captive insurance program, and the reinsurance pool.

On October 22, 2012, the investment committee for Risk & Asset, i.e., Mr. Kadau and Mr. Arnold, held a meeting. A written agenda for the meeting was prepared by RMC Consultants, listing topics of discussion, including the solvency test and a selected investment allocation strategy for Risk & Asset. Mr. Kadau and Mr. Arnold signed the agenda.

IV.   *Captive Insurance Program*

Risk & Asset initially issued the following policies to Surface Engineering: (1) an excess business interruption reimbursement policy, (2) a collection risk reimbursement policy, and (3) a directors and officers liability reimbursement policy. Each policy had an effective date of November 1, 2012, and an ending date of November 1, 2013. The three policies included a written reimbursement policy prepared by RMC Consultants and included defined terms and scope of coverages. The policies contained different annual premium amounts, deductible amounts, and overall policy limits.

Throughout the years at issue Surface Engineering purchased the following Primary Layer Policies from Risk & Asset and paid premiums as follows:

[*12]

| Period: 2012-2013 | | | | | | |
|---|---|---|---|---|---|---|
| Coverage | Effective Date | Policy Number | Occurrence Limit | Aggregate Limit | Deductible/SIR | Premium |
| Excess Business Interruption | 11/1/2012 | C40865BUS002 | 1,400,000 | 1,400,000 | 800,000* | 107,143.00 |
| Collection Risk | 11/1/2012 | C40865COL003 | 800,000 | 800,000 | 5,000** | 10,714.00 |
| Directors & Officers | 11/1/2012 | C40865DAO004 | 800,000 | 800,000 | 5,000 | 32,143.00 |
| | | Totals: | 3,000,000 | 3,000,000 | | 150,000.00 |
| | | | | | * Deductible in first three months is $850,000 per occurrence. | |
| | | | | | ** Deductible is $50,000 per occurrence in first three months of the policy period. | |

| Period: 2013-2014 | | | | | | |
|---|---|---|---|---|---|---|
| Coverage | Effective Date | Policy Number | Occurrence Limit | Aggregate Limit | Deductible/SIR | Premium |
| Excess Business Interruption | 11/1/2013 | C40865BUS002 | 1,400,000 | 1,400,000 | 800,000 | 107,143.00 |
| Collection Risk | 11/1/2013 | C40865COL003 | 800,000 | 800,000 | 5,000 | 10,714.00 |
| Directors & Officers | 11/1/2013 | C40865DAO004 | 800,000 | 800,000 | 5,000 | 32,143.00 |
| | | Totals: | 3,000,000 | 3,000,000 | | 150,000.00 |

| Period: 2014-2015 | | | | | | |
|---|---|---|---|---|---|---|
| Coverage | Effective Date | Policy Number | Occurrence Limit | Aggregate Limit | Deductible/SIR | Premium |
| Excess Business Interruption | 11/1/2014 | C40865BUS002 | 1,400,000 | 1,400,000 | 800,000 | 107,143.00 |
| Collection Risk | 11/1/2014 | C40865COL003 | 800,000 | 800,000 | 5,000 | 10,714.00 |
| Directors & Officers | 11/1/2014 | C40865DAO004 | 800,000 | 800,000 | 5,000 | 32,143.00 |
| Loss of Key Contract | 5/1/2015 | C40865LKC008 | 800,000 | 800,000 | 5,000 | 53,571.50 |
| | | Totals: | 3,800,000 | 3,800,000 | Total: | 203,571.50 |

| Period: 2015-2016 | | | | | | |
|---|---|---|---|---|---|---|
| Coverage | Effective Date | Policy Number | Occurrence Limit | Aggregate Limit | Deductible/SIR | Premium |
| Excess Business Interruption | 11/1/2015 | C40865BUS002 | 1,400,000 | 1,400,000 | 800,000 | 107,143.00 |
| Collection Risk | 11/1/2015 | C40865COL003 | 800,000 | 800,000 | 5,000 | 10,714.00 |
| Directors & Officers | 11/1/2015 | C40865DAO004 | 800,000 | 800,000 | 5,000 | 32,143.00 |
| Loss of Key Contract | 11/1/2015 | C40865LKC008 | 800,000 | 800,000 | 5,000 | 107,143.00 |
| | | Totals: | 3,800,000 | 3,800,000 | | 257,143.00 |

| Period: 2016-2017 | | | | | | |
|---|---|---|---|---|---|---|
| Coverage | Effective Date | Policy Number | Occurrence Limit | Aggregate Limit | Deductible/SIR | Premium |
| Collection Risk | 11/1/2016 | C40865COL003 | 600,000 | 600,000 | 5,000 | 10,600.00 |
| Product Service Rework | 3/1/2017 | C40865PSR012 | 600,000 | 600,000 | 5,000 | 28,266.67 |
| | | Totals: | 1,200,000 | 1,200,000 | | 38,866.67 |

| Period: 2017-2018 | | | | | | |
|---|---|---|---|---|---|---|
| Coverage | Effective Date | Policy Number | Occurrence Limit | Aggregate Limit | Deductible/SIR | Premium |
| Collection Risk | 11/1/2017 | C40865COL003 | 600,000 | 600,000 | 5,000 | 10,600.00 |
| General Liability | 10/18/2017 | C40865CGL015 | 300,000 | 600,000 | *** | 95,431.50 |
| Product Service Rework | 11/1/2017 | C40865PSR012 | 600,000 | 600,000 | 5,000 | 28,266.67 |
| | | Totals: | 1,500,000 | 1,800,000 | | 134,298.17 |
| | | | | | *** Deductible varies by peril. | |

Each of the policies issued by Risk & Asset included a written reimbursement policy issued by RMC Consultants and defined terms and scope of coverage. The policies contained different annual premium amounts, deductible amounts, and occurrence and overall policy limits.

During the years at issue and for each policy purchased from Risk & Asset, Surface Engineering also purchased excess layer coverage policies of the same type and for the same period (as purchased from Risk & Asset) from RMC Property. These excess layer policies were likewise first effective on November 1, 2012, and ending on November 1, 2013. The excess layer policies included a written reimbursement policy,

[*13] issued by RMC Consultants, and likewise defined terms and scope of coverage, an annual premium amount, and an overall policy limit.

The premiums paid to RMC Property were identical to the premiums paid to Risk & Asset, resulting in one total premium amount, with one-half for coverage with Risk & Asset and one-half for excess coverage with RMC Property. These excess layer policies—sometimes referred to as reinsurance—were simultaneously issued by RMC Property and were considered "excess" since a claim under the policy would be paid only after Risk & Asset admitted liability for the full amount of its policy.

Throughout the years at issue Surface Engineering purchased different excess layer policies from RMC Property and paid premiums as follows:

| Period: 2012-2013 | | | | | |
|---|---|---|---|---|---|
| Coverage | Effective Date | Policy Number | Aggregate Limit | Deductible/SIR | Premium |
| Excess Business Interruption | 11/1/2012 | C40865BUS002RMC | 2,100,000 | 1,400,000 | 107,143.00 |
| Collection Risk | 11/1/2012 | C40865COL003RMC | 1,200,000 | 800,000 | 10,714.00 |
| Directors & Officers | 11/1/2012 | C40865DAO004RMC | 1,200,000 | 800,000 | 32,143.00 |
| | | Totals: | 4,500,000 | | 150,000 |

| Period: 2013-2014 | | | | | |
|---|---|---|---|---|---|
| Coverage | Effective Date | Policy Number | Aggregate Limit | Deductible/SIR | Premium |
| Excess Business Interruption | 11/1/2013 | C40865BUS002RMC | 2,100,000 | 1,400,000 | 107,143.00 |
| Collection Risk | 11/1/2013 | C40865COL003RMC | 1,200,000 | 800,000 | 10,714.00 |
| Directors & Officers | 11/1/2013 | C40865DAO004RMC | 1,200,000 | 800,000 | 32,143.00 |
| | | Totals: | 4,500,000 | | 150,000 |

| Period: 2014-2015 | | | | | |
|---|---|---|---|---|---|
| Coverage | Effective Date | Policy Number | Aggregate Limit | Deductible/SIR | Premium |
| Excess Business Interruption | 11/1/2014 | C40865BUS002RMC | 2,100,000 | 1,400,000 | 107,143.00 |
| Collection Risk | 11/1/2014 | C40865COL003RMC | 1,200,000 | 800,000 | 10,714.00 |
| Directors & Officers | 11/1/2014 | C40865DAO004RMC | 1,200,000 | 800,000 | 32,143.00 |
| Loss of Key Contract | 5/1/2015 | C40865LKC008RMC | 1,200,000 | 800,000 | 53,571.50 |
| | | Totals: | 5,700,000 | | 203,571.50 |

| Period: 2015-2016 | | | | | |
|---|---|---|---|---|---|
| Coverage | Effective Date | Policy Number | Aggregate Limit | Deductible/SIR | Premium |
| Excess Business Interruption | 11/1/2015 | C40865BUS002RMC | 2,100,000 | 1,400,000 | 107,143.00 |
| Collection Risk | 11/1/2015 | C40865COL003RMC | 1,200,000 | 800,000 | 10,714.00 |
| Directors & Officers | 11/1/2015 | C40865DAO004RMC | 1,200,000 | 800,000 | 32,143.00 |
| Loss of Key Contract | 11/1/2015 | C40865LKC008RMC | 1,200,000 | 800,000 | 107,143.00 |
| | | Totals: | 5,700,000 | | 257,143.00 |

| Period: 2016-2017 | | | | | |
|---|---|---|---|---|---|
| Coverage | Effective Date | Policy Number | Aggregate Limit | Deductible/SIR | Premium |
| Collection Risk | 11/1/2016 | C40865COL003RMC | 1,400,000 | 600,000 | 10,600.00 |
| Product Service Rework | 3/1/2017 | C40865PSR012RMC | 1,400,000 | 600,000 | 28,266.67 |
| | | Totals: | 2,800,000 | | 38,866.67 |

| Period: 2017-2018 | | | | | |
|---|---|---|---|---|---|
| Coverage | Effective Date | Policy Number | Aggregate Limit | Deductible/SIR | Premium |
| Collection Risk | 11/1/2017 | C40865COL003RMC | 1,400,000 | 600,000 | 10,600.00 |
| General Liability | 10/18/2017 | C40865CGL015RMC | 1,400,000 | 600,000 | 95,431.50 |
| Product Service Rework | 11/1/2017 | C40865PSR012RMC | 1,400,000 | 600,000 | 28,266.67 |
| | | Totals: | 4,200,000.00 | | 134,298.17 |

**[\*14]** Under the terms of the reinsurance agreement between RMC Property and Risk & Asset, RMC Property ceded a portion of its liability under its reinsurance policies, issued to other captive insurance arrangements managed by RMC Consultants, back to Risk & Asset. Under this reinsurance agreement, Risk & Asset agreed to accept, on an indemnity reinsurance basis, the liabilities that RMC Property undertook. In exchange, RMC Property agreed to pay an insurance premium to Risk & Asset which was determined by "the annual rates charged by the Ceding Company for the Covered Liabilities to be reinsured hereunder, net of the Ceding Company's expenses, including but not limited to, commissions." The reinsurance agreement provided that Risk & Asset "shall have no reinsurance obligation or liability with respect to a Policy, which constitutes a part of the Covered Liabilities, for which a reinsurance premium has not been paid." The reinsurance agreement also provided that Risk & Asset's "obligations in connection with the Covered Liabilities shall never exceed an amount that corresponds to the reinsurance premiums paid."

The foregoing transactions can be illustrated as follows:



In sum, all funds paid by Surface Engineering to RMC Property, were then transferred to Risk & Asset, less commissions retained by RMC Property.

Although the premiums were split 50–50 for tax years 2012 through 2015, the coverage limit ratios for the primary and excess layer coverages to Surface Engineering were frequently adjusted. Mr. Rivelle

[*15] initially called for 50–50 split of risk between the primary and excess layers of coverages in his study. He later adjusted this to a 40% to 60% split in insured risk (40–60 split) by RMC Property. On July 22, 2013, Mr. Ankner contacted Mr. Rivelle requesting "an actuarial justification" for the 40–60 split. He responded with the 2013 Rivelle Split Report which retroactively supported the agreed-upon change. The policies issued in tax years 2016 and 2017 to Surface Engineering changed the coverage limit ratio to a 30–70 split. Mr. Bleiweis changed the coverage limit ratio to accomplish RMC Group's desire to have more claims reach the excess layer of coverage. However, no additional actuarial analysis was furnished supporting the change to this 30–70 split.

Mr. Kadau and Mr. Arnold, the officers and directors of Risk & Asset, held annual meetings on September 9, 2013; September 17, 2014; October 14, 2015; October 27, 2016; and December 21, 2017, respectively. RMC Consultants prepared written agendas and resolutions for each annual meeting which listed topics of discussion, including the solvency test and a selected investment allocation strategy for Risk & Asset.

On or around February 2, 2016, Surface Engineering filed one claim with Risk & Asset for $127,089, under its collection risk reimbursement policy for three unpaid customer invoices. Mr. Kadau, in his role as president and director of Risk & Asset, determined that Surface Engineering should instead make three separate claims, one for each invoice. On February 10, 2016, Risk & Asset paid a total of $112,089. This amount constituted the total amount for the three claims less a $5,000 deductible for each individual claim. Then, on or around May 12, 2016, Surface Engineering filed another claim with Risk & Asset for $78,460 under its collection risk reimbursement policy for one unpaid customer invoice. Mr. Kadau approved the claim on May 23, 2016, and Risk & Asset paid $73,460. During 2017 Surface Engineering filed a claim with Risk & Asset for $162,189 under its collection risk reimbursement policy related to some 21 unpaid invoices for a single customer, which were broken into 17 separate claims. The claims were approved on October 12, 2017, and Risk & Asset paid $74,761. During 2016 and 2017 Risk & Asset paid in total $260,310 to Surface Engineering under its collection risk reimbursement policy.

[*16] V.    *Expert Witness Testimony Presented at Trial*

Both parties offered expert witness testimony at trial.

First, we heard from petitioners' expert, Gordon C. Thompson, an actuary and principal/consultant with AmeRisk Consulting, LLC. Mr. Thompson was accepted by the Court as an expert in risk transfer and risk distribution regarding captive insurance companies. He evaluated the captive transaction, made certain observations and drew conclusions from those observations. Mr. Thompson estimated a range of reasonable premiums for the 2012 through 2013 policy year that was based on the assumption that Risk & Asset was a reinsurer of RMC Property for the primary layer and a quota share participant for the RMC Property risk pool.

In his rebuttal report Mr. Thompson critiqued the reports submitted by respondent's experts primarily because this case is about a specific insurance program (in the captive industry), not the National Association of Insurance Commissioners insurance industry in its entirety. He also critiqued respondent's expert witnesses' analyses for relying on hindsight, claiming that premium adequacy is a prospective judgment.

Respondent offered expert testimony from Mark Crawshaw. He holds a Ph.D. in mathematics and has 38 years of industry experience as an actuary, including work with state insurance regulators, commercial insurers, captive insurers, and reinsurers. He is a member of the American Academy of Actuaries and a fellow of the Casualty Actuarial Society. Dr. Crawshaw was accepted by the Court as an expert in actuarial science. In his opening report Dr. Crawshaw opined that primary coverage rates charged by Risk & Asset were excessive by actuarial standards, that the rates charged for excess coverage by RMC Property were similarly excessive, and that there was a minimal transfer or distribution of risk in the arrangement. In his rebuttal report Dr. Crawshaw critiqued Mr. Thompson's analysis.

Respondent also offered expert testimony from David T. Russell, a professor of insurance and finance and director of the Center for Risk Management and Insurance at California State University, Northridge. Dr. Russell holds a bachelor's degree in economics from Amherst College and a master's and a Ph.D. in risk management and insurance, with a related field of finance, from the Wharton School at the University of Pennsylvania. Dr. Russell was accepted by the Court as an expert in

[*17] actuarial science. In his opening report Dr. Russell likewise opined that the premium rates the captive arrangement charged were excessive, that some of the captive policies were nonstandard or covered noninsurance risks, and that there was a minimal transfer or distribution of risk in the arrangement. In his rebuttal report Dr. Russell critiqued Mr. Thompson's analysis.

VI.     *U.S. District Court Proceeding Brought by RMC Group*

In four cases filed in the U.S. District Court for the Middle District of Florida, Mr. Ankner, CJA & Associates, RMC Property, and RMC Consultants (plaintiffs) each filed suit and named the United States of America as a defendant. The civil lawsuits were later consolidated and sought a refund of penalties asserted by the IRS under section 6700 for tax years 2010 through 2016 in relation to the plaintiffs' promotion and management of captive insurance arrangements. In April 2024 the consolidated cases proceeded to trial, and a jury returned a verdict finding that the United States had not proven by a preponderance of the evidence that the plaintiffs were liable for section 6700 penalties. *See Ankner v. United States*, No. 21-cv-00330 (M.D. Fla. Apr. 5, 2024).

The United States (as defendant in this action) did not challenge the RMC Group's captive insurance arrangements for not involving insurable risk, risk shifting, or involving insurance, as understood in the commonly accepted sense, during those cases. On the basis of the jury's findings, the district court entered judgment in favor of the plaintiffs, ordering the refund of section 6700 penalties paid for tax years 2010 through 2016 and dismissing the counterclaims filed by the United States.

OPINION

I.     *Respondent's Motion for Order to Show Cause*

As a preliminary matter the Court must address respondent's Motion for Order to Show Cause. After trial respondent filed his Motion seeking to admit three proposed stipulations of facts that were omitted from the Fifth Stipulation of Facts filed on July 15, 2024.[7] In their Response to Order to Show Cause petitioners contend that the proposed

---

[7] Respondent first sought leave to file his Motion for Order to Show Cause on July 15, 2024. The Court granted leave, and respondent's Motion was filed on July 17, 2024.

**[*18]** stipulations contain inaccuracies derived from communications between counsel in this case and attorneys from the Department of Justice in the case of *Ankner*, No. 21-cv-00330. In addition petitioners argue in their Response that respondent's Motion was untimely in that it was filed after both trial and the closing of the record, which was to be held open until July 15, 2024.[8]

We agree with petitioners' timeliness arguments. Rule 91(f) is to be used when a party has refused or failed to confer with an adversary with respect to entering a stipulation. The purpose of the Rule, therefore, is to either compel a response from the nonmoving party or, if the nonmoving party fails to respond to the motion, to enable the moving party's entry to be deemed stipulated by the Court when no other information is forthcoming. Unless otherwise permitted, a Rule 91(f) motion cannot be filed less than 45 days before trial. Here respondent's Motion was filed after trial and after the record was closed, and thus was made untimely. We will therefore discharge our Order to Show Cause and deny any further relief being sought through respondent's Motion for Order to Show Cause.

## II. *Jurisdiction and Burden of Proof*

In general, the Commissioner's determinations in a Notice of Deficiency are presumed correct, and the taxpayer bears the burden of proving that the determinations are in error. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any deduction claimed. Rule 142(a); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Thus, a taxpayer claiming a deduction on a federal income tax return must demonstrate that the deduction is provided for by statute and must maintain records sufficient to enable the Commissioner to determine the correct tax liability. *See* I.R.C. § 6001; *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976); Treas. Reg. § 1.6001-1(a).

If, in any court proceeding, the taxpayer puts forth credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer and meets certain other requirements, the

---

[8] The Court left the record open at the conclusion of trial for the limited purpose of allowing time for the parties to file a supplemental stipulation of facts relating to pleadings in *Ankner*, No. 21-cv-00330, which were offered as additional exhibits by both parties at the conclusion of trial.

**[\*19]** burden of proof shifts to the Commissioner. I.R.C. § 7491(a)(1) and (2). When each party has satisfied its burden of production, then the party supported by the weight of the evidence will prevail, and thus a shift in the burden of proof has real significance only in the event of an evidentiary tie. *See Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340.

We do not perceive an evidentiary tie in this case and are able to decide the issues on the preponderance of the evidence before us. *See, e.g., Bordelon v. Commissioner*, T.C. Memo. 2020-26, at \*11.

III.    *Microcaptive Arrangement*

We begin by briefly explaining the taxation of microcaptive insurance companies and the deductibility of payments to them. We have previously considered other microcaptive insurance arrangements disputed by the IRS. *See Avrahami*, 149 T.C. 144; *Caylor Land*, T.C. Memo. 2021-30; *Syzygy Ins. Co. v. Commissioner*, T.C. Memo. 2019-34; *Rsrv. Mech. Corp. v. Commissioner*, T.C. Memo. 2018-86, *aff'd*, 34 F.4th 881 (10th Cir. 2022).

Insurance companies (other than life insurance companies) are generally taxed on their income in the same manner as other corporations. *See* I.R.C. §§ 11, 831(a). However, section 831(b) provides an alternative taxing structure for certain small insurance companies such as the one at issue. An insurance company with net written premiums (or, if greater, direct written premiums) that did not exceed a set amount, $1.2 million for tax years through December 31, 2016, and $2.2 million for tax years thereafter, could elect to be taxed under section 831(b). I.R.C. § 831(b)(2). A small insurance company that makes a valid section 831(b) election is subject to tax only on its investment income and is not subject to tax on its earned premiums. *See* I.R.C. § 831(b)(1). When a captive insurance company makes a section 831(b) election, it is commonly referred to as a "microcaptive insurance company."

Typically, amounts paid for insurance are deductible under section 162(a) as ordinary and necessary expenses paid or incurred in connection with a trade or business. *See* Treas. Reg. § 1.162-1(a). Section 162(a) does not prohibit deductions for microcaptive insurance premiums. When such a deduction is available, an insured company may be able to deduct a premium payment to its affiliated microcaptive insurance company under section 162(a) without a corresponding

**[\*20]** inclusion of the premium in the taxable income of the microcaptive insurance company. *See Syzygy Ins. Co.*, T.C. Memo. 2019-34, at *28.

Nonetheless, the deductibility of insurance premiums equally depends on whether they were truly payments for insurance. *See Avrahami*, 149 T.C. at 174, 199; *Syzygy Ins. Co.*, T.C. Memo. 2019-34, at *28; *see also Clougherty Packing Co. v. Commissioner*, 811 F.2d 1297, 1300 (9th Cir. 1987) ("In lieu of purchasing insurance, one may elect to self-insure, paying off claims as they arise or setting aside fixed sums into a reserve account to pay off intermittent losses. While insurance premiums are deductible, amounts placed into self-insurance reserves are not . . . . The appropriate starting point of our analysis is the meaning of 'insurance.'"), *aff'g* 84 T.C. 948 (1985); *Caylor Land*, T.C. Memo. 2021-30, at *31. Thus, this case hinges on whether the captive insurance arrangement meets the definition of insurance.

A.    *Whether the Arrangement Is Insurance*

Neither the Code nor the Treasury regulations define "insurance," and we are guided by caselaw in determining whether a transaction constitutes insurance. *See Avrahami*, 149 T.C. at 174; *Syzygy Ins. Co.*, T.C. Memo. 2019-34, at *28–29. The categorization has profound effects: "[W]hile insurance is deductible, amounts set aside in a loss reserve as a form of self-insurance are not." *Caylor Land*, T.C. Memo. 2021-30, at *31; *see Harper Grp.*, 96 T.C. at 46. When the alleged insurer and insured are related—as will commonly be true in the case of microcaptive insurers—the line between insurance and self-insurance blurs. *See Avrahami*, 149 T.C. at 176–77; *Caylor Land*, T.C. Memo. 2021-30, at *32.[9]

We have historically and consistently considered four nonexclusive factors criteria in deciding whether an arrangement constitutes insurance for federal income tax purposes: (1) the arrangement involves an insurance risk; (2) the arrangement shifts the risk of loss to the insurer; (3) the insurer distributes its risk among its policyholders; and (4) the arrangement is insurance in the commonly accepted sense. *See Avrahami*, 149 T.C. at 177; *Rent-A-Center, Inc. v. Commissioner*, 142 T.C. 1, 13 (2014); *Black Hills Corp. v. Commissioner*,

---

[9] We find it worth noting that Surface Engineering continued to maintain several lines of commercial insurances with Amerisure, and other carriers, including general liability, property, automobile, and workers compensation coverages, throughout the years at issue. These premiums were paid and deducted by Surface Engineering on its tax returns and are not being challenged by respondent.

**[\*21]** 101 T.C. 173, 182 (1993), *supplemented by* 102 T.C. 505 (1994), *aff'd*, 73 F.3d 799 (8th Cir. 1996); *Harper Grp.*, 96 T.C. at 58; *AMERCO & Subs. v. Commissioner*, 96 T.C. 18, 38 (1991), *aff'd*, 979 F.2d 162 (9th Cir. 1992); *Syzygy Ins. Co.*, T.C. Memo. 2019-34, at \*29.

In our prior microcaptive cases we focused on the elements of risk distribution and commonly accepted notions of insurance. *Swift*, T.C. Memo. 2024-13, at \*27; *Caylor Land*, T.C. Memo. 2021-30, at \*32; *see also Avrahami*, 149 T.C. at 181–97. Seeing no reason to vary from our previous analysis, we will focus on those elements again to reach a decision as to whether the microcaptive arrangement before us does (or does not) constitute insurance.

We find for the reasons stated below that petitioners have not met their burden of proof to show that the arrangement distributed the risk of the loss and that the microcaptive arrangement is insurance in the commonly accepted sense, and we therefore determine that it is not insurance for federal income tax purposes. *See Avrahami*, 149 T.C. at 190–91 ("[T]he cases tell us that in deciding whether an arrangement is insurance we can also look at whether it *looks* like insurance in the commonly accepted sense. This is an alternative ground."); *Rent-A-Center*, 142 T.C. at 13 ("[T]he arrangement must . . . meet commonly accepted notions of insurance."); *Harper Grp.*, 96 T.C. at 58 (stating that "each part" of our test for "determining the propriety of claimed insurance deductions by a parent or affiliated company to a captive insurance company . . . must be satisfied," including "whether the arrangement was for 'insurance' in its commonly accepted sense"); *see also Rsrv. Mech. Corp. v. Commissioner*, 34 F.4th at 913–16 (upholding finding that microcaptive insurance policies "did not satisfy the requirement that they be insurance in the commonly accepted sense").

B.   *Risk Distribution*

Risk distribution occurs when the insurer pools a large enough collection of unrelated risks, or risks that are "generally unaffected by the same event or circumstance." *Rent-A-Center*, 142 T.C. at 24; *see also Avrahami*, 149 T.C. at 181. "The idea is based on the law of large numbers—a statistical concept that theorizes that the average of a large number of independent losses will be close to the expected loss." *Avrahami*, 149 T.C. at 181; *see also R.V.I. Guar. Co. & Subs. v. Commissioner*, 145 T.C. 209, 228 (2015); *Securitas Holdings, Inc. & Subs. v. Commissioner*, T.C. Memo. 2014-225, at \*25–26. We have previously said that "[b]y assuming numerous relatively small,

[*22] independent risks that occur randomly over time, the insurer smoothes out losses to match more closely its receipt of premiums." *Rent-A-Center*, 142 T.C. at 24 (quoting *Clougherty Packing Co. v. Commissioner*, 811 F.2d at 1300); *Beech Aircraft Corp. v. United States*, 797 F.2d 920, 922 (10th Cir. 1986) (holding that risk shifting occurs only if a party transfers a risk of loss to another party, and if the insured retains the risk of his own loss, the arrangement is self-insurance, which "is not the equivalent of insurance"); *see also Steere Tank Lines, Inc. v. United States*, 577 F.2d 279, 280 (5th Cir. 1978) (per curiam) (holding that a "true insurance contract" requires the shifting or distribution of risk);. Here, we must analyze whether there was risk distribution from the perspective of Risk & Asset, the purported microcaptive insurer, because "it is the insurer's risk, not the insured's, that is reduced by risk distribution." *Swift*, T.C. Memo. 2024-13, at *28.

In prior captive insurance cases taxpayers have argued that the captive insurer achieved risk distribution by insuring against sufficiently numerous, diverse, and independent risk exposures through (1) direct policies to brother-and-sister entities with a large enough pool of unrelated risks or (2) participation in an insurance pool, whereby the pool performs the functions of an insurance company. *See Avrahami*, 149 T.C. at 182–90; *Rent-A-Center*, 142 T.C. at 24; *Harper Grp.*, 96 T.C. at 52. Petitioners argue that Risk & Asset distributed its risk by participating in the RMC Property reinsurance pool. We disagree.

Respondent first argues that the direct policies written by Risk & Asset to Surface Engineering failed to distribute risk because the policies did not have a sufficient number of insured risks or a pool of unrelated risks. We agree with respondent.

We have previously determined there to be an insufficient number of pooled risks when a captive insurance company issues only a handful of policies. *Compare Avrahami*, 149 T.C. at 184, *with Rent-A-Center*, 142 T.C. at 24. Furthermore, on brief, petitioners acknowledged that the mere handful of primary layer policies issued by Risk & Asset to Surface Engineering—on their own—fail to achieve risk distribution. Rather, petitioners contend that risk distribution was achieved "through its participation in a reinsurance pool that adhered with the issued guidance from the IRS." In other words petitioners contend the "reinsurance pool" whereby reinsurance policies issued by RMC Property, to Risk & Asset, transferred insurable risk which in turn satisfied Risk & Asset's risk distribution requirements. Accordingly, we will turn our focus to this argument.

**[*23]**  In our previous cases we have analyzed this question by reference to the factors used to determine whether a company is a bona fide insurer: (1) whether the company was created for legitimate nontax reasons; (2) whether there was a circular flow of funds; (3) whether the entity faced actual and insurable risk; (4) whether the policies were arm's-length contracts; (5) whether the entity charged actuarially determined premiums; (6) whether comparable coverage was more expensive or even available; (7) whether it was subject to regulatory control and met minimum statutory requirements; (8) whether it was adequately capitalized; and (9) whether it paid claims from a separately maintained account. *See, e.g.*, *Rsrv. Mech. Corp.*, T.C. Memo. 2018-86, at *38–39. After consideration of several factors detailed below, we hold that risk distribution was not achieved through the reinsurance arrangement.[10]

If the RMC Property reinsurance pool did not perform the functions of a bona fide insurance company, then the policies it issued to Surface Engineering were not insurance policies, and likewise, Risk & Asset did not and could not achieve risk distribution through reinsuring those policies. *See Swift*, T.C. Memo. 2024-13, at *32.

C.     *Circular Flow of Funds*

Mr. Kadau is the sole owner of both Surface Engineering and Risk & Asset. Surface Engineering purchased excess layer policies issued by RMC Property and paid an alleged premium. RMC Property then paid Risk & Asset a purported reinsurance premium under the Reinsurance Agreement. The purported premium was equal to the premium paid to RMC Property by Surface Engineering, less a 2–2.5% fee. In sum, Mr. Kadau never lost control of his money. The only interruption of funds was fees charged by RMC Group and miniscule claims activity in the pool.[11] Dr. Crawshaw, respondent's expert, specifically noted that "the money left Surface Engineering, went through the whole apparatus [of RMC Property], and came back to [Risk & Asset]."

---

[10] On brief respondent contends as a preliminary matter that insufficient evidence was offered regarding the excess layer policies since "they have offered virtually no information about the participants in the RMC P&C risk pool." Respondent also points to testimony from Mr. Bleiweis of RMC Group and the company's "quest to get claims into the excess layer."

[11] Dr. Crawshaw noted that the anticipated losses capable of reaching the excess layer of coverage represented "only some 4% (about $65,000) of total premiums paid ($1.65 million)" by Surface Engineering.

[*24] This arrangement essentially resulted in a near circular flow of funds after fees resulting in marginal capitalization and suggests an arrangement that is not arm's length. *See Avrahami*, 149 T.C. at 186 ("While not quite a complete loop, this arrangement looks suspiciously like a circular flow of funds."); *see also Swift*, T.C. Memo. 2024-13, at *33; *Rsrv. Mech. Corp.*, T.C. Memo. 2018-86, at *41.

D.      *Arm's-Length Contracts*

Respondent presented testimony from Dr. Russell, who determined that the premiums paid by Surface Engineering were 2.5 and 3.5 times more expensive per dollar of coverage than comparable commercial policies. Petitioners, in rebuttal, point to the commercial general liability policy added in tax year 2017, which was priced the same as Surface Engineering's then-existing commercial general liability policy. While true, this is only one instance of reasonableness of premiums and does not establish whether comparable coverage was more expensive or unavailable. Furthermore, the limited capitalization of Risk & Asset of only $50,000 plus initial premiums of $300,000 reflects undercapitalization and inability to pay should a significant claim be made. In sum, the premiums charged by Risk & Asset, and subsequently the reinsurer RMC Property, reflect that both the primary and excess layer policies were not arm's-length contracts.

E.      *Actuarially Determined Premiums*

Next, we address whether the premiums charged for the primary and excess layer policies were actuarially determined. Neither the Code nor the regulations define "actuarially determined" premiums in the context of captive insurance, and so we rely on caselaw for guidance. *See Syzygy Ins. Co.*, T.C. Memo. 2019-34, at *34. In prior microcaptive cases we have considered a few factors, including whether a one-size-fits-all approach was used, which occurs when participants in the reinsurance pool pay the same percentage of direct written premiums to the reinsurance entity, and whether the reinsurance entity's loss ratios deviated significantly from the industry standard. *See, e.g., Jones v. Commissioner*, T.C. Memo. 2025-25, at *39, *supplemented by* T.C. Memo. 2025-78; *Swift*, T.C. Memo. 2024-13, at *35–36 ("Charging a uniform reinsurance premium percentage to all captives participating in the pool based on general lines of coverage and amount of underlying premium plainly fails to account for the specific risks presented by each of the agreements being reinsured through the pools."). We have previously held that premiums were actuarially determined when the company

[*25] relied upon an outside consultant's "'reliable and professionally produced and competent actuarial studies' to set premiums." *Syzygy Ins. Co.*, T.C. Memo. 2019-34, at *34 (quoting *Rent-a-Center*, 142 T.C. at 27 (Buch, J., concurring)). In contrast, "[w]e have held that premiums were not actuarially determined when there has been no evidence to support the calculation of premiums." *Id.*

Petitioners rely on Mr. Rivelle, who performed the initial calculations, asserting that he is an "independent qualified professional actuary with over thirty years of experience, in setting premiums for its captive arrangements." We have substantial reservations about petitioners' blind reliance. First, reliance on Mr. Rivelle's actuarial report is suspect, as it was prepared in a matter of days and after a single phone call with Mr. Kadau. Mr. Kadau further testified at trial that he did not provide RMC Group or Mr. Rivelle with any documents about Surface Engineering. This alone suggests that actuarial analysis is lacking here, and it is not the first time we have called into question Mr. Rivelle's calculations or lack thereof. *See Royalty Mgmt. Ins. Co. v. Commissioner*, T.C. Memo. 2024-87, at *47 (concluding that Mr. Rivelle's calculations suggested that he failed to perform actuarial analysis).

Many of our previous concerns articulated in *Royalty Management* are reflected again here in Mr. Rivelle's feasibility study. As discussed further below, Mr. Rivelle's report did not split the premium for each type of coverage between the primary layer policy issued by Risk & Asset and the excess layer policy issued by RMC Property, but rather recommended a single overall premium for each type of coverage. The first use of these numbers occurred in 2013. Mr. Bleiweis testified that the RMC Group internally and independently deviated from Mr. Rivelle's advised split (between the primary and excess layer policy coverages) because "it didn't seem right" to the RMC Group that "the risk should be split 50/50 when RMC Property's risk was excess over the captive's risk." Yet on the basis of testimony from Mr. Rivelle and Mr. Bleiweis, the 2012 numbers were neither revised nor updated at any point during these years of use. Respondent's expert Dr. Crawshaw opined that this lack of review was contrary to typical industry practice.

For six years without any revision RMC Property and Risk & Asset charged the same premiums based entirely on Mr. Rivelle's recommendations from 2012. Even in the absence of rate changes, Dr. Crawshaw noted in his report that premiums for individual businesses

[*26] typically change over time because of their individual circumstances (such as changes in revenues, business activities, number of employees, etc.). When evaluating the loss ratio of what Dr. Crawshaw called Risk & Asset's "assumed business" (i.e., the risk that Risk & Asset purportedly reinsured under the Reinsurance Agreement), Dr. Crawshaw estimated that RMC Property received premiums totaling about $50 million for the years at issue while the actual claims submitted to RMC Property under excess layer policies totaled $17,611, resulting in an actual loss ratio of 0.035%. In short, Dr. Crawshaw's report asserts that the premiums being charged by RMC Property simply did not correlate with the risks they assumed.

We find that the initial 2012 calculations performed by Mr. Rivelle were not actuarily determined as they were not "'reliable and professionally produced and competent actuarial studies' to set premiums." *Syzygy Ins. Co.*, T.C. Memo. 2019-34, at *34 (quoting *Rent-a-Center*, 142 T.C. at 27 (Buch, J., concurring)).

We further find issue with how the RMC Group determined the split of risk in relation to the split of premiums between the primary and excess layers of coverage. We find that the premiums simply did not correlate with the risks assumed and the RMC Group, by their actions explained below, clearly agreed. Risk was split between the primary layer and the excess layer in varying proportions throughout the life of the reinsurance arrangement. The split of risk was so arbitrary that the RMC Group independently changed the risk ratio multiple times over the years at issue. Mr. Bleiweis testified that the reason the RMC Group initially changed the split was that they realized they were not "getting enough claims into the excess layer" and that their goal and motivation with each (near yearly) reassessment "was to get claims into the excess layer." However, the 40–60 split of risk used from 2012 through 2015 was not actuarially justified, but during that period less than 50% of expected losses were insured by RMC Property. While Mr. Rivelle testified that he eventually provided a written report in 2013 to the RMC Group indicating the 40–60 split "was a reasonable split based upon actuarial standards," he also testified that he did not know who determined the 40–60 split. No evidence was presented at trial to show that the 2013 Rivelle Split Report was used to review the 2012 40–60 split for the captive arrangement among Surface Engineering, Risk & Asset, and RMC Property, or to review any of the other captives that participated in the RMC Property risk pool and reinsured RMC Property.

**[\*27]** Finally, petitioners argue that the premiums for the general liability policy from 2017 to 2018 were actuarily determined because they used premiums set by the commercial carrier that had issued the policy the captive's policy was replacing. Or, as Mr. Bleiweis testified, he "drafted [the] policy using premiums set by [a] commercial carrier." In short, the RMC Group admitted that Mr. Bleiweis copied the numbers from Surface Engineering's previously purchased general liability policy and reused these numbers, without validating or revaluating them, when designing the new 2017 and 2018 policies by Risk & Asset. Mr. Bleiweis, as noted, is not an actuary, and RMC Property did not provide any calculations, communications, or other documents to demonstrate that these 2017 and 2018 premium valuations were actuarily determined beyond Mr. Bleiweis's claim. We determine this copying to lack actuarial review.

We find that there is insubstantial evidence to support the calculation of premiums applied by the RMC Group and that the subsequent premium splits were actuarially determined.

F. *Whether Respondent Conceded Three of the Four Elements of Insurance*

At trial petitioners presented jury instructions from *Ankner* wherein the United States did not challenge the issues of transfer of risk, insurance in the commonly accepted sense, and insurable risk for the same reinsurance arrangement issued by the RMC Group. Petitioners are essentially arguing that the principle of estoppel applies in this case and herein precludes respondent from challenging the reinsurance arrangements between Risk & Asset and RMC Property as being insurance. We disagree. There is a distinction between "not contesting an issue" and conceding an issue. We conclude the legal doctrine of estoppel does not apply here.

Under the doctrine of collateral estoppel, or issue preclusion, once an issue of fact or law is "actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153 (1979). "Collateral estoppel . . . has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979). It also "fosters reliance on judicial action by minimizing the

[*28] possibility of inconsistent decisions." *Montana*, 440 U.S. at 154. First, petitioners acknowledge that three of the four legal issues involving the RMC Group's reinsurance arrangement now before the Court were not litigated in *Ankner*. It is also undisputed that Mr. Kadau, Risk & Asset, and Surface Engineering were not parties to the *Ankner* litigation. Accordingly, and for these two reasons, we find collateral estoppel does not apply.

Judicial estoppel applies in the Tax Court. *See Huddleston v. Commissioner*, 100 T.C. 17, 28 (1993). Generally, three nonexhaustive factors guide our analysis when asked to invoke this doctrine. We consider whether (1) "a party's later position [is] 'clearly inconsistent' with its earlier position," (2) "the party has succeeded in persuading a court to accept that party's earlier position," and (3) "the party seeking to assert an inconsistent position would derive an unfair advantage." *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001). Where (as here) a party seeks to invoke judicial estoppel on the basis of a prior proceeding to which it was not a party, the Court of Appeals for the Eleventh Circuit—the court to which an appeal would presumably lie— instructs trial courts to apply a stricter, two-factor test. I.R.C. § 7482. That test asks whether "(1) the party took an inconsistent position under oath in a separate proceeding, and (2) these inconsistent positions were 'calculated to make a mockery of the judicial system.'" *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1181 (11th Cir. 2017) (quoting *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002)). We find neither element of the Eleventh Circuit test has been met. Accordingly, judicial estoppel is inapplicable.

G.   *Rev. Rul. 2002-89*

Petitioners further argue that Risk & Asset achieved risk distribution because it earned more than 50% of its premiums from unrelated entities through the RMC Group reinsurance pool, thereby falling within a "safe harbor" provided under Rev. Rul. 2002-89, 2002-2 C.B. 984. We have previously held that the Commissioner is required to follow his revenue rulings, and we have treated revenue rulings as concessions by the Commissioner where those rulings are relevant to the disposition of a case. *See Rauenhorst v. Commissioner*, 119 T.C. 157, 171–73 (2002). But for us to treat a revenue ruling as a concession by the Commissioner, the facts of the taxpayer's transaction must be substantially the same as those in the revenue ruling. *See Barnes Grp., Inc. v. Commissioner*, T.C. Memo. 2013-109, at *37–38, *aff'd*, 593 F. App'x 7 (2d Cir. 2014). We find that the facts here are not

[*29] substantially the same as those in Rev. Rul. 2002-89 and, therefore, decline to apply it.

First, by its terms Rev. Rul. 2002-89 is applicable only if "[i]n all respects, the parties conduct themselves consistently with the standards applicable to an insurance arrangement between unrelated parties." Rev. Rul. 2002-89, 2002-2 C.B. at 984. As we discuss below, RMC Property was not operated consistently with the standards applicable to an insurance arrangement between unrelated parties.

Second, in Rev. Rul. 2002-89 the amounts paid by the insured to the captive were "established according to customary industry rating formulas." *Id.* As we discuss below, the premiums paid to RMC Property were extraordinarily high when compared to premiums set by standard industry formulas.

Third, petitioners' reliance on the "safe harbor" in Rev. Rul. 2002-89 has not been established. Dr. Crawshaw opined, without being refuted, that the RMC Group reinsurance pooling arrangement did not meet the 50% standard found in the ruling, and he calculated only 18% of Surface Engineering's total future losses reached the excess or reinsurance layer of coverage. This is consistent with the testimony offered by Mr. Bleiweis and evidenced by the RMC Group's arbitrarily increasing the allocation of risk between RMC Property and Risk & Asset from the 40–60 split to a 30–70 split.

IV.  *Commonly Accepted Notions of Insurance*

Failure to achieve risk distribution is enough for us to conclude that the transactions were not insurance transactions for federal income tax purposes. *See AMERCO*, 96 T.C. at 40 (holding that risk distribution is "necessary to the existence of insurance"); *see also Avrahami*, 149 T.C. at 190–91. In line with our prior microcaptive cases, we will also address the issue of whether the captive arrangement constituted insurance in the commonly accepted sense. *See, e.g.*, *Avrahami*, 149 T.C. at 191; *Swift*, T.C. Memo. 2024-13, at *37.

To determine whether an arrangement constitutes insurance in the commonly accepted sense, we look at a number of factors, including (1) whether the insuring company was organized, operated, and regulated as an insurance company; (2) whether it was adequately capitalized; (3) whether the policies were valid and binding; (4) whether premiums were reasonable and the result of arm's-length transactions; and (5) whether claims were paid. *See Avrahami*, 149 T.C. at 191;

[*30] *see also Caylor Land*, T.C. Memo. 2021-30, at *39–40; *Syzygy Ins. Co.*, T.C. Memo. 2019-34, at *37–38; *Rsrv. Mech. Corp.*, T.C. Memo. 2018-86, at *48; *cf. Syzygy Ins. Co.*, T.C. Memo. 2019-34, at *41 (noting that "whether the fronting carriers operated in a bona fide fashion" is also relevant). We will address each of these factors in turn.

Petitioners contend that Risk & Asset was formed for a valid business purpose, the issuance of insurance contracts. Petitioners further contend that Risk & Asset meets all the requirements for an arrangement that constitutes insurance in the commonly accepted sense. Respondent contends that Risk & Asset did not provide insurance in the commonly accepted sense. Respondent further contends that the RMC Group's premium payments to Risk & Asset completed a circular flow of funds.

A.    *Organization, Operation, and Regulation*

First, we consider whether Risk & Asset was organized, operated, and regulated as an insurance company. There is no dispute that Risk & Asset was incorporated and regulated as a captive insurance company in Nevis. Beyond the organizational formalities, however, we find the operation of Risk & Asset troubling and a factor weighing against petitioners.

In considering whether Risk & Asset operated as an insurance company "we must look beyond the formalities and consider the realities of the purported insurance transactions." *Hosp. Corp. of Am. v. Commissioner*, T.C. Memo. 1997-482, 1997 WL 663283, at *24 (citing *Malone & Hyde, Inc. & Subs. v. Commissioner*, 62 F.3d 835, 842–43 (6th Cir. 1995), *rev'g* T.C. Memo. 1989-604). We will not discuss portfolio diversification, as the parties agree that Risk & Asset has met the regulatory guidelines for Nevis.

Risk & Asset's planning, incorporation, and operations during the years at issue were managed entirely by Mr. Kadau and Mr. Arnold. Risk & Asset had no employees (as directors are not employees) that performed services of any kind. We note that Mr. Arnold appears to have been appointed as a director merely to satisfy the regulatory requirements of Nevis as he did not materially participate in the management of Risk & Asset despite his titles.

Other than the feasibility study produced by Mr. Rivelle in 2012, there is no evidence that any due diligence was performed over the years regarding the premium prices set by Risk & Asset. The feasibility study

**[\*31]** produced by Mr. Rivelle gave an overview of Surface Engineering's operations, which is typical for the industry. We are concerned, however, with the fact that it was completed from one generic questionnaire and a single phone call with Mr. Kadau. Mr. Kadau's testimony that he did not provide Mr. Rivelle with any documents about Surface Engineering only furthers our concerns.

Equally, there is no evidence that Risk & Asset performed any due diligence with respect to the reinsurance agreements executed with RMC Property. RMC Property appears to have unilaterally determined the payments owed by the parties. Surface Engineering purchased excess layer policies issued by RMC Property and paid an alleged premium. RMC Property then paid Risk & Asset a purported reinsurance premium under the Reinsurance Agreement. The purported premium was equal to the premium paid to RMC Property by Surface Engineering, less a retained 2–2.5% fee. In sum, Mr. Kadau never lost control of his money. The only interruption of funds, i.e., the difference between payments, was fees charged by RMC Group and miniscule claims activity in the pool.

During the years at issue Risk & Asset's investments comprised cash, a single annuity provided by RMC Group, and a $6 million life insurance policy insuring Mr. Kadau. By the end of 2017 the life insurance policy represented more than half of Risk & Asset's available funds. As opposed to being reinvested or held by the captive, the tax-free withdrawals from the annuity were used to pay the premiums due on the life insurance policy. The life insurance policy in question was described by petitioners as "a low commission, high cash-value policy" that "required significant cash outlay at the beginning of the investment." Petitioners emphasize that, unlike in *Syzygy Insurance Co.*, T.C. Memo. 2019-34, at \*41, their life insurance policy should not be considered an inappropriate investment. Petitioners argue that the life insurance policy differentiated itself because Risk & Asset could access the cash value of the policy, borrow against the policy, and surrender or cancel the policy. We disagree and find the distinction petitioners are making to be self-serving and unconvincing.

First, the total amount of the life insurance policy at issue was chosen to cover "all [of Mr. Kadau's] mortgages to protect his family in the event of his death," and second, an insurance policy, equal to half of the overall investment portfolio, is simply not the most effective means of investing premiums to hedge against risk, regardless of Risk & Asset's right to borrow against, or cash in, the insurance policy. Indeed,

**[\*32]** following a notice of audit from the IRS regarding the matter specifically, Risk & Asset subsequently canceled the life insurance policy and shifted its investment strategy towards preferred stocks, an action they would not have undertaken had the policy indeed been the best course of investment.

Although Risk & Asset was organized and regulated as an insurance company, we conclude its choice of operations and investments weighs heavily against its being an insurance company in the commonly accepted sense.

### B. *Minimum Capitalization Requirements*

We have consistently held that an insurer is adequately capitalized if it meets the relevant jurisdiction's minimum capitalization requirements.[12] *See Avrahami*, 149 T.C. at 193; *Caylor Land*, T.C. Memo. 2021-30, at \*43; *Syzygy Ins. Co.*, T.C. Memo. 2019-34, at \*41; *Rsrv. Mech. Corp.*, T.C. Memo. 2018-86, at \*53. The parties agree that Risk & Asset, despite being thinly capitalized, met the legal minimum capitalization requirement for Nevis. There equally appears to be no dispute between the parties over RMC Property's capitalization requirements. We find this factor to be neutral.

### C. *Valid and Binding Policies*

Next, we examine whether the policies were valid and binding. Caselaw is not entirely clear on what makes a policy "valid and binding." We have held that policies are valid and binding when "[e]ach insurance policy identified the insured, contained an effective period for the policy, specified what was covered by the policy, stated the premium amount, and was signed by an authorized representative of the company." *Securitas Holdings, Inc.*, T.C. Memo. 2014-225, at \*28; *see also R.V.I. Guar. Co.*, 145 T.C. at 231 (finding that policies were valid and binding when the insured filed claims for covered losses and the captive insurance company paid them).

We have also examined factors beyond whether the policies are simply binding, such as conflicting or cookie-cutter policy terms or the

---

[12] Risk & Asset was originally capitalized with $350,000, with $50,000 as capital on hand and $300,000 used to purchase the $6 million life insurance policy on Mr. Kadau. Respondent's expert witness Dr. Crawshaw testified that in his opinion Risk & Asset's capacity to pay claims was weak, since its capitalization never reached a point where it could pay out $1.4 million in claims.

**[\*33]** delivery of claims-made policies after the end of the claims period. *See Avrahami*, 149 T.C. at 194 (examining conflicting policy terms); *Caylor Land*, T.C. Memo. 2021-30, at \*44 ("Writing and delivering 'claims made' insurance policies *after* the claim period is, we find, abnormal and is to any reasonable observer just plain silly."); *Rsrv. Mech. Corp.*, T.C. Memo. 2018-86, at \*54 (describing policies as cookie-cutter and not necessarily appropriate); *see also Syzygy Ins. Co.*, T.C. Memo. 2019-34, at \*42 ("Here the dispute surrounding valid and binding policies centers on whether the policies were timely issued, identified the insured, and specified what was covered by the policies.").

Generally, the policies in question (both the primary and excess layer coverages) contained the necessary terms to make them valid and binding insurance contracts. Several policies, however, included terms that limited coverage, generally, beyond the general scope, and several failed to define beneficiaries. *Royalty Mgmt.*, T.C. Memo. 2024-87, at \*19 ("Misidentifying the insured party in an insurance contract is not a trivial error.").

Importantly the terms of the Directors and Officers Liability Reimbursement policies lacked a duty-to-defend provision, rendering the insured unprotected by the insuring captive. These policies also limited coverage to "Insured Occurrences" arising from claims "alleging negligence or willful or intentional misconduct in connection with the performance of a person's duties as an Officer or Director of Surface [Engineering]." The term "Officer" was defined as "a person appointed or elected by a corporation's Board of Directors to fill a position of corporate officer created by the corporation's Articles of Incorporation or By-Laws." The term "Director" was also not defined despite being used. Strictly interpreted, Risk & Asset's primary policies and RMC Property's excess policies covered Surface Engineering but did not provide insurance coverage to any individual.[13]

The captive policies at issue were reimbursement policies, making them different from commercial market policies that typically pay for losses and defense costs "up front" on behalf of the insured. Other than the commercial general liability policy, the captive policies at issue include no cancellation provisions and few coverage exclusions.

---

[13] If the ordinary meaning of "Director" is substituted in place of the undefined term, however, then two individuals would be covered. The ordinary meaning of Director includes "a member of the corporation's board of directors." In this instance, such a policy would cover, in its entirety, only two people: Mr. Kadau and Mr. Arnold.

**[\*34]** We find the evidence regarding the validity of Risk & Asset's and RMC Property's policies to be mixed and conclude that this factor weighs slightly against petitioners.

### D. *Reasonableness of Premiums*

We next consider whether the premiums charged were reasonable and the result of an arm's-length transaction. *See Avrahami*, 149 T.C. at 194–96. We find that they were not.

We first note that the total premiums were priced by Mr. Rivelle in his actuarial report, which notably did not analyze Risk & Asset's financial resources or its ability to pay prospective claims. During trial Mr. Rivelle testified that he did not receive any documents related to Surface Engineering or its business and that he did not review any of Surface Engineering's commercial insurance policies during the process. Mr. Rivelle's underwriting report moreover did not supply any calculations to support how he arrived at the premium prices. Risk & Asset issued primary insurance policies to Surface Engineering from 2012 through 2017. Simultaneously, RMC Property issued companion excess insurance policies that provided an additional excess limit. Given the limitation clause embedded in each excess policy, it seems to us distinctly unlikely that RMC Property would pay any excess claim. The policy detailed that the "liability attaches to the Insurance Company issuing this Excess Layer Policy 13 only after the Primary Insurer has paid or admitted liability for the full amount of its respective net loss liability." In short, RMC Property would pay the excess claim only if Risk & Asset paid the primary claim.

The premiums paid by Surface Engineering, however, for both captive and excess-layer coverages, were equally divided between Risk & Asset and RMC Property.[14] Risk under the policies issued from 2012 to 2015 was split 40–60. Under those issued from 2016 to 2017 it was split 30–70. The 2015 policies covering excess business interruption and directors' and officers' liability were canceled mid-term. All premiums for the years at issue were determined by prorating the annual premium from Mr. Rivelle's actuarial report, without any further actuarial review or update.

---

[14] Premiums received by RMC Property were essentially transferred to Risk & Asset, petitioners' wholly owned captive insurer, through a reinsurance arrangement, as discussed above.

**[\*35]** Respondent's expert Dr. Russell calculated that Surface Engineering's captive program premiums for the primary layer policies had an average rate-on-line of 5.6–5.7%, while the policies they purchased outside of the captive program had an average rate-on-line of 1.8% and 2.3%. This amounts to Surface Engineering's paying roughly 2.5 to 3.5 times more to its captive than on its commercial policies. A higher rate-on-line means that insurance coverage is more expensive per dollar of coverage. Thus, a higher rate-on-line leads to a greater deduction for premiums. *Syzygy Ins. Co.*, T.C. Memo. 2019-34, at \*31. In an arm's-length negotiation, an insurance purchaser would want to negotiate lower instead of higher premiums. Seemingly then, the main advantage of paying higher premiums is to increase deductions. *Id.* at \*34.

In 2017 Surface Engineering replaced their commercial policy, previously provided by Amerisure, with the captive commercial general liability policies. The annual premium for Surface Engineering's general liability policy with Amerisure was $189,181 for 2017 and 2018, before its cancellation. The total annual premium for 2017 and 2018 for the captive commercial general liability policy was $190,863, or $1,682 more than the premium for the Amerisure policy they replaced. As noted earlier, these captive policies also included limited terms, and conflicting terms regarding the duty of the insurer, here Risk & Asset, to defend the insured.

Risk & Asset did not receive any claims from Surface Engineering during the first four years at issue (2012 through mid-2015). Despite the lack of claims, Risk & Asset never reduced any of the premiums charged to Surface Engineering. We further note that despite the various policies offered, and paid for, the captive received claims exclusively under the Collection Risk policy. If one were to disregard the federal tax benefits, petitioners would have been in the same position economically had they simply put the amounts claimed as premiums in a bank account to be drawn upon in the event of losses.[15] In sum, we find this factor weighs heavily against petitioners.

---

[15] Mr. Kadau asserts in testimony that part of the intention behind creating the captive was to keep the money Surface Engineering paid in premiums for captive coverages "in [his] own bank," instead of paying for commercial insurance where he would "never, ever see that money again."

[*36] E.    *Review and Payment of Claims*

All claims made by Surface Engineering were under its primary layer policies issued by Risk & Asset; no claims were made, or paid, under the excess layer coverages issued by RMC Property.

Accordingly, we look to how Risk & Asset handled claims; namely, whether they were paid and how claims were reviewed. Claims were reviewed periodically by the claims committee. This committee consisted of only two voting members, Mr. Arnold and Mr. Kadau, neither of whom held any prior experience in insurance. The committee met all of three times to review claims filed during the years at issue. For tax years 2012, 2013, 2014, and for most of 2015, Surface Engineering submitted no claims to the captive arrangement. In 2015 following the notice of an IRS audit, three claims were summarily filed under the collection risk reimbursement policy. This third claim was split into 17 separate claims by the committee during the respective meeting.

We note that Mr. Arnold was not present for any of the three meetings. Mr. Kadau instead acted as Mr. Arnold's proxy, thereby making Mr. Kadau the sole determinant of each meeting and each claim. In sum, Mr. Kadau, the only voting member present in person at any of the three meetings to determine and assess all claims submitted to Risk & Asset, served as the sole payment authorizer. In all three claims meetings, which together totaled only 53 minutes, the committee, i.e., Mr. Kadau, decided that "there is no need for an adjuster," resulting in the committee's granting payment without either an independent adjuster or all members of the committee present.

Claims submitted to Risk & Asset were paid, but as discussed above we find the process perfunctory. The fact that claims were paid weighs slightly in favor of petitioners; however, we do not regard payment of claims "as overwhelming evidence that the arrangement constituted insurance in the commonly accepted sense." *See Syzygy Ins. Co.*, T.C. Memo. 2019-34, at *45; *see also Rsrv. Mech. Corp.*, T.C. Memo. 2018-86, at *61. In sum, we find this factor to be neutral.

F.    *Conclusion*

Most of the foregoing factors weigh against petitioners. Accordingly, even if we were to assume risk distribution was achieved under the microcaptive arrangement, we conclude petitioners have not proven that the payments they seek to deduct as insurance expenses

**[*37]** were for insurance in the commonly accepted sense; nor have they established that the payments were for insurance for federal income tax purposes. Since we have determined the payments made were not insurance for federal income tax purposes, we equally hold that they do not constitute deductible payments under section 162.

V.    *Whether the Payments by Surface Engineering Are Accumulated Earnings and Profits*

In the First Amendment to Answer, filed with leave of Court, respondent asserts against petitioners an increased tax deficiency attributable to Risk & Asset's accumulated earnings and profits. According to respondent, petitioners are subject to tax on subpart F income of Risk & Asset for tax year 2017. We do not find respondent's arguments compelling, nor do we find them well supported.

As previously stated, the Commissioner's determinations set forth in a Notice of Deficiency are presumed correct. Rule 142(a); *Welch v. Helvering*, 290 U.S. at 115. However, if the Commissioner asserts an increased deficiency or new matter after a Notice of Deficiency is issued, then he bears the burden of proof as to the increased deficiency or new matter. Rule 142(a)(1); *Wayne Bolt & Nut Co. v. Commissioner*, 93 T.C. 500, 507 (1989).[16]

Respondent contends that because Risk & Asset is not an insurance company, it is not eligible to make an election under section 953(d). Section 953(d) applies only to a foreign company which would qualify as an insurance company under subchapter L of the Code if it were a domestic corporation. *See* I.R.C. § 953(d)(1)(B); *Rsrv. Mech. Corp.*, T.C. Memo. 2018-86, at *62–63. Since the microcaptive insurance arrangement policies were not contracts for insurance, respondent contends that Risk & Asset does not fall within the meaning of an insurance company in section 831(c), which is defined in section 816(a) as "any company more than half of the business of which during the taxable year is the issuing of insurance or annuity contracts or the reinsuring of risks underwritten by insurance companies." Respondent contends this makes Risk & Asset ineligible to make an election under section 831(b) for any year at issue. Likewise, Risk & Asset must meet this definition of "insurance company" to elect to be treated as a

---

[16] Rule 142(a) places the burden of proof on the Commissioner "in respect of any new matter." A "new matter" includes a matter first asserted in the Commissioner's Answer, as opposed to the Notice of Deficiency.

**[\*38]** domestic corporation under section 953(d)(1)(B).[17] *See also Avrahami*, 149 T.C. at 198. Therefore, Risk & Asset's section 953(d) election is likewise invalid for the years at issue. Consequently, respondent contends that petitioners must include $1,130,516 in gross receipts for tax year 2017, less deductions allowed for reported cash or cash equivalents, resulting in unreported taxable income under section 965 of $331,586.

Petitioners dispute these arguments, citing respondent's published guidance and section 111, the Tax Benefit Rule. Petitioners' principal contention—regardless of the recharacterization of petitioners' claimed deductions—is that the amounts paid are nontaxable contributions of capital.

We acknowledge that "Revenue Ruling 2005-40 does not declare that when an ostensible insurance arrangement fails to adequately distribute risk it must be recharacterized as a contribution to capital." *See Rsrv. Mech. Corp.*, 34 F.4th at 918. Rev. Rul. 2005-40, however, mentions some nonexclusive alternatives such as deposit arrangement, a loan, and contribution of capital. Whether an alternative characterization of premiums is appropriate depends upon both the objective facts of the transaction and the subjective intent of the parties. *Rsrv. Mech. Corp.*, T.C. Memo. 2018-86, at \*65.

Here, the objective reality is that Surface Engineering and Risk & Asset entered into contracts that required Risk & Asset to pay if it suffered losses covered by the contracts. We find those contracts are not insurance contracts and that the policies, with their unreasonable premiums, had no legitimate business purpose. Therefore, the premiums are not deductible. These conclusions, however, do not mean that the transfer of funds from Surface Engineering to Risk & Asset could not serve an otherwise legitimate business purpose such as the contribution of capital. *See Rsrv. Mech. Corp. v. Commissioner*, 43 F.4th at 918 (analyzing Rev. Rul. 2005-40). Respondent bears the burden here, and we find he has not otherwise established that the transfer of funds

---

[17] Section 953(d) allows a controlled foreign corporation (CFC) engaged in the insurance business to elect to be treated as a U.S. corporation for U.S. tax purposes. To make a valid election under section 953(d), a CFC must first be an "insurance company," which is defined in section 816(a) as "any company more than half of the business of which during the taxable year is the issuing of insurance or annuity contracts or the reinsuring of risks underwritten by insurance companies." *Keating v. Commissioner*, T.C. Memo. 2024-2, at \*71; *see also Rsrv. Mech. Corp.*, T.C. Memo. 2018-86, at \*62.

**[\*39]** from Surface Engineering to Risk & Asset should not be reclassified as nontaxable contributions of capital. *Cf. Gulf Oil Corp. v. Commissioner*, 914 F.2d 396, 411–13 (3d Cir. 1990) (finding that although premiums paid to an insurance subsidiary were not deductible as payments for insurance because the risk was not truly distributed, the court refused to characterize the premium payments by subsidiaries as dividends to the parent corporation followed by a capital contribution from the parent to the purported insurance company because the insurance subsidiary did provide a benefit—risk coverage—to its affiliates), *aff'g* 86 T.C. 115 (1986), 87 T.C. 135 (1986), *and* 89 T.C. 1010 (1987), *and aff'g in part, rev'g in part* 86 T.C. 937 (1986). We therefore decline to sustain the increased deficiency of $131,308.

VI.    *Penalties*

Both Notices of Deficiency determined accuracy-related penalties under section 6662. The Notices first contend petitioners are liable for penalties under section 6662(i) because any underpayments were attributable to nondisclosed transactions (i.e., a microcaptive insurance arrangement) lacking economic substance as described in subsection (b)(6). In the alternative, or to the extent section 6662(i) penalties do not apply, respondent contends petitioners are liable for accuracy-related penalties under section 6662(a) and (b)(1) and (2). Before trial respondent conceded the penalties under section 6662(b)(6) and (i) for tax years 2016 and 2017.

Petitioners assert two defenses against the above penalties: (1) reasonable cause due to reasonable reliance in good faith on professional advice under section 6664(c)(1) and Treasury Regulation § 1.6664-4 and (2) reduction of the understatements due to substantial authority under section 6662(d)(2)(B)(i).

A.    *Penalty Approval*

Section 6751(b)(1) provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination." The parties have stipulated that respondent has satisfied his burden to prove that the initial determinations of the penalties were timely approved in writing by the immediate supervisor of the individual who made the determinations, as required under section 6751(b). We accept this stipulation and accordingly need not decide the issue.

[*40]  B.    *The Gross Valuation Misstatement Penalty*

Respondent contends that petitioners are liable for 40% accuracy-related penalties under section 6662(b)(6) and (i) for the tax years 2012 through 2015 because their underpayments for those years were attributable to a nondisclosed transaction lacking economic substance.

In 2010 Congress enacted the Health Care and Education Reconciliation Act of 2010 (Act), Pub. L. No. 111-152, § 1409, 124 Stat. 1029, 1067–70, adding a new 20% penalty on the portion of an underpayment attributable to "[a]ny disallowance of claimed tax benefits by reason of a transaction lacking economic substance (within the meaning of section 7701(o)) or failing to meet the requirements of any similar rule of law." I.R.C. § 6662(b)(6). Section 6662(i) increases that penalty to 40% if the underpayment is attributable to a "nondisclosed noneconomic substance transaction." Section 6662(i)(2) defines a "nondisclosed noneconomic substance transaction" as one with respect to which the relevant facts affecting the tax treatment are not adequately disclosed in the return or in a statement attached to the return.

The Act also added a new subsection (o) to section 7701 of the Code, codifying the "economic substance" doctrine. That subsection provides a conjunctive test whereby a transaction is treated as having economic substance only if (1) "the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position" and (2) "the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction." I.R.C. § 7701(o)(1). The codified economic substance doctrine applies "[i]n the case of any transaction to which the economic substance doctrine is relevant." *Id.* And the determination of whether the economic substance doctrine "is relevant" must be made in the same manner as if section 7701(o) had never been enacted. I.R.C. § 7701(o)(5)(C).

To date, there has been minimal caselaw addressing these provisions. In none of the microcaptive insurance cases decided to date did this Court address whether the transactions lacked economic substance within the meaning of section 7701(o)(1). Nor did those opinions consider what constitutes "adequate disclosure" of a microcaptive transaction under section 6662(i)(2). The Court has withheld ruling on these questions and ordered additional briefing on the "relevancy" question. *See Patel v. Commissioner*, T.C. Memo. 2024-34, at *3 n.5; Order, *Patel v. Commissioner*, Nos. 24344-17, et al. (T.C.

**[*41]** July 19, 2024) (No. 366). We will accordingly defer ruling on the applicability of the 40% penalty in this report, which will be addressed in a subsequent ruling.

C.    *Reasonable Cause Defense*

This Court has stated that reliance on a tax professional may constitute reasonable cause and good faith. Reasonable cause requires the taxpayer to have exercised ordinary business care and prudence. *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 93 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002). The taxpayer must establish by a preponderance of the evidence that (1) the adviser was a competent professional who has sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. *Id.* at 99. In considering reasonable cause and good faith, the most important factor is generally the extent of the taxpayer's effort to assess the correct tax liability. Treas. Reg. § 1.6664-4(b)(1). We look at all pertinent facts and circumstances, including the taxpayer's knowledge, education, and experience. *Id.*

"If a taxpayer alleges reliance on the advice of a tax professional, that 'advice must generally be from a competent and independent advisor unburdened with a conflict of interest and not from promoters of the investment.'" *Oakhill Woods, LLC v. Commissioner*, T.C. Memo. 2020-24, at *29 (quoting *Mortensen v. Commissioner*, 440 F.3d 375, 387 (6th Cir. 2006), *aff'g* T.C. Memo. 2004-279); *see Gustashaw v. Commissioner*, 696 F.3d 1124, 1139 (11th Cir. 2012), *aff'g* T.C. Memo. 2011-195. "Advice hardly qualifies as disinterested or objective if it comes from parties who actively promote or implement the transactions in question." *Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1382 (Fed. Cir. 2010). "A taxpayer advancing a reliance-on-professional-advice defense must also show that it actually relied in good faith on the advice it received." *Oakhill Woods*, T.C. Memo. 2020-24, at *29.

Petitioners identified two advisers upon whom they relied: RMC Consultants and Mr. Rivelle. Petitioners argue that they worked with Mr. Rivelle to produce an actuarial report and the general underwriting of insurance for Mr. Kadau. We acknowledge that Mr. Rivelle is an independent qualified actuary with over 30 years of experience in setting premiums for captive arrangements. However, we have substantial reservations about petitioners' blind reliance. The extent of communication between Mr. Kadau and Mr. Rivelle regarding Surface

**[\*42]** Engineering was limited to a feasibility study questionnaire relating to Surface Engineering and a single phone call to discuss the results of the questionnaire. Moreover, Mr. Rivelle worked with petitioners only with regard to tax year 2012, and his calculations did not consider, or at least no work was shown to have considered, the impact of the reinsurance policies provided by RMC Property. As discussed above, and with no further actuarial studies or reports beyond the initial study by Mr. Rivelle, the parties independently chose to shift risk from the primary coverage to the excess layers by amending the split of risk in tax year 2012 from 50–50 to 40–60 to a 30–70 split by tax year 2016.

However, while petitioners substantially relied on Mr. Rivelle, he was not without peers in this process. As noted earlier, the RMC Group hired Mr. Rivelle on the advice of their own legal department. The driving force of that department, and their microcaptive industry, was Mr. Bleiweis. Mr. Bleiweis prepared the RMC Group's marketing materials—such as brochures and opinion memorandums—that were circulated to prospective clients, including Mr. Kadau. Although prospective clients of the RMC Group were advised to consult their own tax advisers, these promotional materials included detailed discussions on the tax implications of forming a captive insurance arrangement. Mr. Bleiweis's tax experience is noted on the materials as follows: "He advises senior management on legal and tax issues related to the design and administration of insurance products, employee benefit plans, and risk management services. . . . He has also testified before the Internal Revenue Service." This information, among other technical memoranda addressing tax issues, was prominent in these marketing materials despite the fact that it was the general policy of the RMC Group to not serve as tax advisers for its clients. The promotional materials used by the RMC Group contained prominent disclaimers and clear recommendations that participants should consult their own tax and legal advisers. In any event, since the RMC Group was a promoter of the microcaptive insurance arrangement, Mr. Kadau could not reasonably rely on any advice offered. *See Avrahami*, 149 T.C. at 206; *106 Ltd. v. Commissioner*, 136 T.C. 67, 79 (2011), *aff'd*, 684 F.3d 84 (D.C. Cir. 2012); *see also Royalty Mgmt.*, T.C. Memo. 2024-87, at \*53.

Accordingly, we find Mr. Kadau has failed to establish his reasonable cause defense, since we find his reliance on Mr. Rivelle and the RMC Group to be unjustified and lacking necessary and accurate information establishing good faith reliance. *See Estate of Lee v.*

**[\*43]** *Commissioner*, T.C. Memo. 2009-84, 2009 WL 1118876, at \*5 (citing *Neonatology Assocs.*, 115 T.C. at 99).[18]

### D. *Substantial Authority Defense*

The penalty does not apply to any portion of an understatement attributable to a taxpayer's tax treatment of an item "if there is or was substantial authority for such treatment" or there is a reasonable basis for the taxpayer's treatment of the item and the facts relevant to the tax treatment of the item are adequately disclosed on the return or an attached statement. I.R.C. § 6662(d)(2)(B). In evaluating whether a taxpayer's position regarding the treatment of a particular item is supported by substantial authority, the weight of authorities in support of the taxpayer's position must be substantial in relation to the weight of the authorities supporting contrary positions. Treas. Reg. § 1.6662-4(d)(3)(i). Authority, for purposes of determining whether there is substantial authority for a taxpayer's treatment of an item, includes the Code, the regulations, caselaw, and certain IRS administrative pronouncements. *Id.* subdiv. (iii).

Petitioners cite Rev. Rul. 2002-89 and point us to our opinion in *Avrahami* to justify their formation and operation of Risk & Asset. Petitioners contend that in *Avrahami* we stated that we declined to impose accuracy-related penalties since it was a "case of first impression" and our opinion was not issued until late 2017—after the years at issue here.

We find petitioners' reliance on Rev. Rul. 2002-89 misplaced, as the ruling plainly, first, regards a parent-subsidiary arrangement and, second, forewarns that the IRS would only respect the transaction when both risk-shifting and risk-distribution are achieved under the arrangement where the "parent's premiums are pooled with those of unrelated parties." Rev. Rul. 2002-89, 2002-2 C.B. at 984. In sum, and as detailed above, the facts found in Rev. Rul. 2002-89 are distinguishable from those before us, and we find petitioners' reliance on this administrative guidance misplaced.

---

[18] Furthermore, the evidence of petitioners' actual reliance, let alone good-faith reliance, on any judgment that the RMC Group may have reached is underwhelming. *Cf. Avrahami*, 149 T.C. at 207 (stating that, as part of a finding of reasonable reliance on professional advice, the adviser credibly testified that specific advice was given and that the taxpayer credibly testified that he proceeded with a microcaptive arrangement because of the adviser's blessing).

**[\*44]** While we observed as part of our analysis of good faith in *Avrahami*, 149 T.C. at 207, that "[t]his is a case of first impression," we did so only after finding that the taxpayers actually and reasonably relied on advice from a competent professional, *see id.* at 206–07.[19] While the issues were somewhat novel at the time, this does not excuse petitioners from penalties in the absence of any efforts on their part to ascertain their correct tax liabilities or apply well-settled principles of taxation to their situation. *See Neonatology Assocs., P.A. v. Commissioner*, 299 F.3d at 234–35 (stating that taxpayers could not avoid accuracy-related penalties, even though they were without direct precedent to guide them, because their case "does not involve novel questions of law but rather is concerned with the application of well-settled principles of taxation to determine whether certain expenditures made by close corporations are deductible as ordinary and necessary business expenses"). In sum, we reject petitioners' substantial authority defense.

E. *Section 6662 Accuracy-Related Penalties*

The Commissioner determined in the two Notices of Deficiency that petitioners were liable for section 6662(a) accuracy-related penalties for the years at issue. Mr. Kadau was liable alone with respect to tax years 2012 through 2014, and Mr. and Mrs. Kadau were both liable for tax years 2015 through 2017.

Section 6662(a) imposes a 20% penalty on the portion of an underpayment of tax required to be shown on a return that is attributable to any substantial understatement of income tax, *see* I.R.C. § 6662(b)(2), or negligence or disregard of rules or regulations, *see* I.R.C. § 6662(b)(1). An understatement is substantial if it exceeds the greater of (1) 10% of the tax required to be shown on the return for the tax year or (2) $5,000. *See* I.R.C. § 6662(d)(1)(A). Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Code, and disregard includes any careless, reckless, or intentional disregard. *See* I.R.C. § 6662(c). The understatements in this case are substantial for all years at issue because they are greater than 10% of the amount required to be shown on the tax returns and exceed $5,000. It is therefore unnecessary for us to determine whether the underpayments are attributable to negligence or disregard of rules or regulations. *See*

---

[19] This case is more akin to cases where a taxpayer did not actually "get advice or a professional's judgment that they could have reasonably relied upon." *See Caylor Land*, T.C. Memo. 2021-30, at \*53.

**[*45]** *Avrahami*, 149 T.C. at 204–05; *see also* Treas. Reg. § 1.6662-2(c) (providing that only one accuracy-related penalty for a given tax year may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one ground). Respondent has met his burden of production with regard to the accuracy-related penalties, and petitioners have the burden of proof to show that respondent's penalty determinations are incorrect.

Petitioners contest these accuracy-related penalties and assert that they satisfy the reasonable cause exception or substantial authority defense to the penalties. We have previously considered and rejected petitioners' arguments. Accordingly, we will sustain section 6662(a) accuracy-related penalties as determined in the Notices of Deficiency on the basis of underpayments attributable to substantial understatements of income tax. *See* I.R.C. § 6662(b)(2).

To reflect the foregoing,

*An appropriate order will be issued, and decision will be entered in due course upon completion of further proceedings.*